Please all rise. Hear ye, hear ye. This honorable appellate court for the 2nd Judicial District is now open. The Honorable Susan F. Hutchinson presiding. Please be seated. Your honors, we have a case of non-performance 2-24-0350, North Shore Gas Company and the People's Gas, Light, and Health Company petitioner's appellants, the Illinois Commerce Commission and the people of the state of Illinois, Ex Rel. Kwame Raoul, Attorney General of the state of Illinois. Respondents and police. Arguing on behalf of the appellant, Mr. James E. Goldschmidt. Arguing on behalf of the Illinois Commerce Commission, Mr. Robert Funk. Arguing on behalf of the people, Ex Rel. Kwame Raoul, Mr. Matthew J. Pryor. Good morning, counsel and guests. You will note that we have our third panel member on Zoom. And so don't forget that he's here and look at it from time to time. And we are now ready if you are. So Mr. Goldschmidt. Thank you, your honor. May it please the court. James Goldschmidt on behalf of North Shore Gas and People's Gas. With me at council table are my partner, Chris Skea, and my colleague, Mackenzie Guttner, who was of great assistance on the briefs. Well, we have identified four symptoms of the same underlying infirmity in the commission's interpretation of the prudence standard. The first is that the appellant's and are happy to address any of those to the extent you have questions. We hope to use our limited time to focus primarily on the shop's disallowance. That issue is nearly a quarter of a billion dollars. This is the most financially significant of our four issues, but it also provides the clearest evidence of what we mean when we say that this commission has significantly raised the bar on prudence. There are four. Now, if I understand correctly, and we all have a lot of paper, I can see it in front of us, and I have my own. What's happening at these shops? What's the issue that they need to be either upgraded or rebuilt? These shops are the beating heart of the People's Gas utility operations. They are the three shops in the northern part of Chicago, the central part of the city, and the southern part of Chicago, out of which all of the gas utility operations occur. Not corporate headquarters, but the rest of what happens. They suspected it wasn't corporate headquarters. Yes. So running all the trucks, all the crews, out to the customers' homes and lighting gas lights and all of that happens out of these three shops. And they're spread across the city, geographically distributed deliberately to be efficient in their location. That also places constraints on what you can do in terms of replacing them when you need to do something about a new site, because you don't want to cluster all of them in one part of the city, for example. And that has implications for real estate. But in any event, what happened here really has four key problems. And the first is the standard of analysis that the commission set for what it needs to see in order to approve a capital expenditure, it says, quote, of this magnitude without specifying exactly what that means. And that standard, as the commission set it here, is focused on optimal or ideal decision-making as opposed to reasonable decision-making, which is what the prudent standard has only ever required. Isn't it reasonable to look at alternatives but before deciding to tear down and rebuild or, I mean, why not repair? Or why not a different location? Why not? And I get your argument that you want to spread out over the city, but in the same general location or to buy an existing building, rehab. Yes, Your Honor, it is prudent, reasonable to look at alternatives. And the company did so here. Did you submit evidence of that? Yes, and I'll point you to it, Your Honor. So starting with the Moraleson studies, going back several years before the decision was taken to replace these shops, the Mortenson Consulting Group evaluated the condition of each of these shops and specifically recommended that based on their remaining useful life, they all be replaced. And that is, I'll give you just a few pages specific to each shop. So at A1818 of the appendix, that is the replace recommendation for the North shop. At A1856, that is the recommendation to replace the Central shop. And then at A1935, that is Mortenson's recommendation to replace the South shop. That's not all the company submitted. They worked with two other consultants thereafter to confirm those replacement recommendations. And then they also placed in the record here the internal corporate decision to replace each of those shops, including what they analyzed in connection with that decision. That was done across three separate corporate presentations and decisions as well. So for the North shop, you have the presentation at A2387. Then for the other two, there are similar entries in the record, A2401 for the Central shop. And finally, A2413 for the logistics support construction. And you'll notice similarities between all of these presentations. But what they all have in common is a section on background and project need, including a discussion of why the considerable age of most of these facilities results in diminishing returns for repair alternatives or upgrades. It specifically says that complete building renovation is not recommended due to the likelihood of asbestos and other costly environmental materials in the existing facilities. It includes a discussion of project benefits at, for example, A2389 for the North shop, discussion of the project history, and an estimate of costs. So to the extent the commission was looking for a cost-benefit analysis, you do have a corporate decision here reflecting a discussion of benefits and the associated costs. But after putting all of that in and more, including testimony, identifying all of these expert consulting reports of all of the company's efforts to go through three years of analysis to reach this important decision, the commission said, it isn't enough. And what in particular did they want beyond what you have supplied for your clients, then? Yeah, that's what we would like to know as well, Your Honor. But really what the commission says at page 56 of its order is that the company failed to supply cost-benefit analyses for each facility and a thorough analysis of alternatives for each facility that evaluated the cost and operational considerations of repair, repurpose, and replace options. They wanted rate impact assessments for each of those. And if you look at page 28 of our reply brief, we lay out the checklist that the commission said is the full set of information it wants to see before approving a capital expenditure of this magnitude. Well, might it, but that's just, I know it's speculation, but let's talk about it a little bit. Is it, can you pull these things out of what you presented? Could it be a matter of how they were presented as opposed to missing or insufficient information? We believe that what we submitted was sufficient, even according to what the commission said it wanted. But the problem is that the commission either didn't consider the information to be packaged in the right way or didn't fully. Here's one other issue. And I apparently cut you off, and I do apologize for that. But here's the point. Why all of them at once? Wasn't that a major consideration? And the failure to maintain these buildings? The record did reflect that the buildings were in disrepair and needed to be replaced somewhat urgently. I think it's one of those situations where, you know, you patch and fix for as long as you can until you can't anymore. And these buildings were all of a similar age. So they all aged out around the same time. They didn't actually all get reconstructed on the same timeline. South shop lagged behind. And so it was more gradual than literally all at once. But this was the fact that they were all built around the same time and buildings have an end to their useful life. Our concern here is that what the commission has really done is articulated a standard, a rule for all of the information that it wanted to see after the fact, and then didn't give the companies a chance to meet it even in rehearing when there is already a rule on point that says what the commission needs to see to approve capital projects of this magnitude. And that is the rule under the commission's own rule governing what goes on to the schedule F4. This was an issue in Amarin, the recent fifth circuit decision. And if you look at footnote four of that decision, it describes everything that the company is supposed to provide for any capital project that ends up on a schedule F4. That is a description of when the project started, the completion date, the completion cost, the reason for the project, alternatives considered and reasons for rejecting each alternative, and a list of reports relied upon by management when it decided to pursue the rate base addition. Now, there's no dispute that the company provided that schedule F4 information in this case, just like in Amarin. No one said you didn't meet the commission's rules on schedule F4. The commission said, yeah, we appreciate that you submitted that information, but that's a minimum. We want even more. And here's the list of what we want. And because you didn't provide it, we're not approving this capital expenditure. Well, Amarin clearly says, if you want to do that, you need to make a rule. You don't announce it in an order. You don't tell the companies after the fact this is the information we would have needed to see because how can they go back at that point and recreate an analysis from 2015 that they didn't know at the time they needed to complete? It's not just Amarin that decided this in the fifth district. The Illinois Power Company decision that we said in our briefs also provides a very good discussion of this dynamic. This is the 2003 decision, also from the fifth district, 339, ILL-APP-3RD-425. And if you look at around the middle of that decision, starting at page 439 in the APP-3RD Reporter, they describe how Illinois Power Company had the experience of submitting capital projects for approval year over year and having the commission expect a certain type of information, a certain baseline with the rules provided. And then one day the commission said, well, this time we want a present value revenue requirement economic analysis to justify these capital expenditures on some propane plants. And the court said, no, there would have been no basis for a reasonable person acting reasonably at the time this decision was made to think that the commission would want that kind of analysis when it had never asked for it before. And I think one question for opposing counsel, if they come up here, it would be, where in commission precedent has the commission ever requested that list of information for a capital project? Point to one example. The company was not on notice that this type of information would be needed. And that's a problem. That's a problem from a prudent standard perspective in terms of how high the bar is set. Because the prudence bar is not that high. It doesn't require the best decision. It doesn't require an optimal decision. It requires a reasonable one. And stepping back, no one here thinks it was unreasonable to replace hundred-year-old shops that were falling apart. The commission just didn't like the form of the evidence it received. But setting aside that problem with the bar, there's also a problem with the process. The process of telling a company after the fact without making a rule that you lose a quarter of a billion dollars because you didn't give us this laundry list of information that we never told you we wanted. That's a process issue. And it needs to be reversed regardless of what the court believes about the prudent standard. And then- Let me back up for a second. You're relying heavily on the Mortensen report. And is it your position that Mortensen considered alternatives or not? Yes. And decided repair is not a reasonable alternative because? Yes, so if you look at the scorecards, for example, that Mortensen prepared, their whole scoring system from one through four is based on whether the buildings in each of their systems, Shell, Core, HVAC, are one, past the end of their useful life, two, near the end of their useful life, three, within their useful life, or four, new in good function. And what that corresponds with is what is the opportunity, what is the availability for reuse as opposed to replacement? If those buildings are scoring all the way down towards one, that means patch and fix isn't a viable alternative anymore according to Mortensen. And two other consultants after Mortensen went on to confirm that. This is what a prudent company does. It consults with experts, gets their recommendations, considers them, and then makes a considered decision to move forward. But there's no evidence in the record that anyone who analyzed this came forward and said, well, you know, if you just spent 10 more, $10 million on the roof, we could keep these buildings another 10 years. That's not there. And that's actually the third problem with what the commission decided here because it wrote off the entire amount when no one identified what the better alternative was or what it would have cost. So are you suggesting you should get all of the money you asked for or some reduced amount? We're suggesting we should get all of it because there was no basis to reduce it. But if the commission was going to reduce it, it should have reduced it to the difference between whatever we did and whatever the commission believed we should have done, not zero. There was no $0 solution here. And even if the commission's position was we could have solved the problem for just $20 million of repairs, then 20 million is what we should have gotten, not zero. The commission didn't do any of that analysis. And that's actually arbitrary and capricious. To say everyone agrees, and the commission said this, everyone agrees something needed to be done. And therefore, the cost of this is not zero. But then impose a $0, 100% disallowance is flatly inconsistent, Your Honor. All right, let me ask you this. If we were to agree with your argument, remand for further hearing, or do we pick a number? We would ask that you reverse and remand with instructions to the commission to allow the full amount. Well, what's your backup position? What's my backup position? The only other evidence in the record that comes close to an alternative disallowance is the AG's calculation that said we benchmark construction, actual construction costs against what the consultants estimated it would cost early in the process. And that was a $66 million disallowance. And so that, if the commission were being reasonable about imposing a disallowance and it wanted to find something, it would have said, this is the analysis we have in the record. No one else came forward with a cheaper alternative. So $66 million write off and call it a day. Well, one of the witnesses, I think, on behalf of the public interest organizations did some sort of review of the numbers, I guess you could call it. You had an opportunity, or not you personally, but your client had opportunity, possibly, to cross-examine that, to ask how did that occur. When you say nothing, and basically she says nothing. I think her name is Catherine Elder, maybe, is one of the persons. She has testified that the reports did not demonstrate the new operational facilities were in customer's best interest. And she did some math and she did her own comparison. And that allegedly is one of the things that was accepted by the commission, is that correct? I don't see anything in the commission's decision that relies on that analysis, as to the shops. The analysis that I was referring to was performed by the AG's witness, Mr. Walker. That's the alternative that you discussed with Justice Jorgensen. But I'm saying that she testified that they just, rebuilding and possibly some of the issues were not in the customers. That would be who she was representing in her testimony. Not in their best interest. But you had an opportunity to cross-examine that and question that, correct? Yes, Your Honor. And to be clear, we are not disagreeing with the commission's ultimate conclusion on prudence. The problem is the commission established an informational requirement and said it couldn't consider whether the company had acted prudently without that information. Well, the information is there. And if you want more information than your rules require, you need to make a rule. That's our complaint. So yes, there was dispute on the record about whether it was prudent or not to replace these shops. The commission really pulled its punches and said, sorry, you didn't provide this information so we don't have what we need to conclude that it was prudent. That's the problem. Justice Burkett, do you have any questions? I think he said no. So you'll have an opportunity to respond. OK, thank you. Thank you. And I understand counsel has agreed to split their time, but I don't know who wants to go first. So you can choose. Good morning, Your Honors. Good morning. May it please the Court, my name is Robert Funk from the Illinois Commerce Commission. And my colleague, Matthew Froelich, is from the Attorney General's Office, and he represents the people. We've both prepared remarks for the Court this morning. We'll split response time equally. I will address the issue of the dispute    I will address the issues related to PGL's SMP, and if time permits, the great case expense, and if needed, any questions about the long-term grid infrastructure plan. Mr. Froelich will address the disallowances related to PGL's new shop. Hold on just a second. The last issue, it's my understanding you filed a motion indicating that you've resolved that issue? The commission entered an order reopening the underlying docket's stated purpose was to rescind the direction to PGL and Moreshore to file long-term grid infrastructure. Has that order been answered? That final order, the order reopening, Your Honor, has been opened. The final? The case has been initiated, but because everybody has an opportunity for notice and an opportunity to be heard on reopening, that status is set for next week. But I would expect shortly after that the commission will enter a final order consistent with its stated intention. Okay. A question or a point about the standard of review. Commission's decisions need to be supported by substantial evidence, and substantial evidence is subject to the manifest weight. We've heard a lot of argument this morning about the prudent standard and trying to apply legal analysis to that, and PGL is seeking a Genova review. But I think it's clear from the facts that the council's talked about, the facts that the parties developed in their briefs, that this is a fact-intensive inquiry. Prudence asks, what would a reasonable utility manager do under the similar circumstances? And that's a fact-intensive inquiry, and that is subject to a substantial evidence manifest weight of the evidence standard. And the commission is entitled to deference with respect to its resolutions of questions of fact. Well, as presented in the briefs, the issue doesn't seem to be so much that no evidence was presented, it's certain evidence was not presented. Is that correct? Certain evidence that the commission wanted or the attorney general wanted, or however, this pans out in the end. With respect to the shops, and I'm going to let the attorney general respond, there certainly was a question about the quantum of evidence that the PGL supplied the court, or the commission, excuse me. And the commission was critical of what it didn't have. I mean, obviously, there was some evidence in the record, the Mortensen Report and others, but on balance, the commission weighed that evidence and found that it didn't establish what a reasonable, prudent manager would do. And similarly, if I could turn to the SMP, the commission found that the $265 million that TGL sought for purposes of the SMP program, it had not proved that those costs were prudent and reasonable. And I think it's important in the context of the SMP for the court to understand that we're talking about a future test year. We're setting up a budget. So this 2023 rate case was about a budget for the 2024 test year that PGL selected. So it was simply a forecast of what it thought it should spend in the future test year. And then that amount would continue until the next rate case. It was not, and there never has been, a disallowance of any SMP costs that PGL actually spent. And I think it's important. They characterize it as such sometimes, and that's not accurate. It was a disallowance of their proposed budget because the commission found it wasn't prudent. And that budget was always, the concept of a budget was always known or should have been known to people's gas, I can't use the initials as well as you do. Yes, Your Honor. A test year is always included in a traditional rate case such as this rate case. What had happened for about 10 years prior to this rate case is PGL recovered under a statute that is now sunset called the QIP Qualified Infrastructure. And it did not need to go through this process. It did not need to select a future test year in that context where it simply files a petition saying we spent this much on qualifying infrastructure, and then that is later approved up in a reconciliation proceeding. That's different than in a future test year where not only are capital investments examined, but everything, the return on equity, and all the components of what make up a utility's quote revenue requirement are forecasted in the future, and they say here's what we're going to need in order to keep the lights on and earn a reasonable profit. And I want to point out to the Court as well with respect to the Commission's entire disallowance with the exception of $28.5 million for emergency work, that the Commission was always, as it was analyzed in the SMP, concerned with safety. And that's certainly one of its primary responsibilities as the utility regulator, is to ensure that utilities are providing their services safely. And that's why it said first in the final order that it was not exempting or not excluding any funds for emergency work to repair. Well, isn't the devil's in the details what's in emergency work? Isn't that kind of the issue? It absolutely is, Your Honor. And I think the Court should understand that in the original, the underlying proceeding, the Commission was never presented with any of these subcategories. There was no breakdown for SI or PI or emergency work. It was just all SMP and or the neighborhood-by-neighborhood approach. It wasn't broken down. The Commission asked for that information, but PGL declined to provide it. That was in the discovery phase, though, right? Correct, correct. After the final order was entered and PGL asked for rehearing, it came in and said, oh, we have all these subcategories. We have SI, PI, and guess what? We also have emergency work. And for the last three years prior to this rape case, we spent $28.9 million for emergency work. And so the Commission said, well, we think your evidence is weak, but we're going to give you $28.5 million a year for emergency work because we believe it's important and we want you to have the funding to repair leaks and respond to other emergent-type situations. The fact that PGL used the rehearing process to kind of bootstrap all of this work that was designed to prevent leaks or designed to prevent... The replacement. Correct. That's the entire SMP. That's what the SMP is trying to discover. That is what the SMP is intended to do. It's intended to remove all of this leak-prone pipe that is on PGL's system, and everybody acknowledges that. And everybody acknowledges the need to remove it. So in that sense, the entire SMP is designed to promote safety. You get this bad pipe out of the ground, a new pipe in, and nobody can test that. The Commission paused the SMP for purposes of its investigation because it was not satisfied that the SMP was proceeding in a way that promoted safety. It was 19 years behind. That may be, but if you stop it completely, and we all know these pipes are crumbling by the day, how prudent is that? It's a fair question, Your Honor, and I think the Commission was torn. Do we keep throwing money in a program that seems to be not being managed in a way to get to the end result? Or do we take a pause temporarily and figure out how we can get this system or this program working better? And it did. So the investigation is over. The SMP is back on. The pause has been lifted. PGL has filed a new rate case. It was a temporary pause. I think that when we look at the scheme, the dates that were at issue is the Commission, or excuse me, PGL, the expert, suggested that this pipe be removed by 2030. The Commission determined that it was going to be much longer. So we're looking at 25 years before the pipe is apparently going to be replaced, at least on the schedule that it's been at, and the Commission found it worthy or worthwhile, rather than spending billions of additional dollars on this program, to take a temporary pause, investigate if there were ways to do it better and faster. Okay, and you said that that now is the subject of a new rate hearing? So I can tell the Court that the Commission concluded that investigation, and I believe within a couple of weeks, PGL filed a new rate case. Are the same dollars at issue in that new case? I can't tell you, Your Honor, what dollars are at issue in there. I can only tell you, Your Honors, that PGL certainly had the opportunity to reintroduce those same dollars. Does that make these issues moot? I think there's a question about that. I think that to the extent that PGL has alleged that the Commission committed an error, that is a question that we've responded to, and that they hadn't satisfied the prudent standard. But certainly upon the entry of the final order in this pending rate case, the prior test year and the rates that were entered by the Commission in its final order as amended, in this case, that will no longer be valid. So we can't grant the relief sought? That's the definition of mootness. It is, Your Honor. Okay, thank you. Well, we have to check with Justice Burkett, but I have a question before that. There was the pause. There was a new rate case identified. Has anything happened in that case yet? I don't think so, Your Honor. I think it's at its very initial stages. And how long does an investigation or does a hearing of that nature take? By statute, the Commission must resolve the rate case within 11 months. I'm sorry? Eleven months. Okay. So to this point, you don't know if it's started, if it's... I think it's in its infancy. I think it's a 2026 case. Okay. Justice Burkett, anything? Just one question. The PGL argues that you developed an entirely new heightened prudence standard. Do you want to address that? Thank you, Your Honor. No, the Commission has not developed a new prudence standard. I think it's important, as I mentioned earlier, that prudence is a fact-intensive question. So prudence is evaluated on a case-by-case basis, given the facts, what are the circumstances, and then asking what would a reasonable utility manager do in those circumstances. The SMP has not been before the Commission in a traditional rate case for almost 10 years. And the SHOPS example that was discussed earlier, and again, I'll let Mr. Fryhoek address those. But the Commission was never faced with a question about how do we deal with the utility that has decided to replace wholesale, all of its shops and facilities, with brand new facilities. That issue had not come before the Commission before. And so the question I think that the Commission asked is what would a reasonable prudence utility manager do before they decided to replace all of their shops at the cost of a quarter billion dollars and suggested to PGL that it was much more than what they had done. But Mr. Fryhoek is the best person to answer that question. Anything else, Justice Burkett? Thank you, Your Honor. Thank you. All right, Mr. Fryhoek. Good morning, Your Honors. Matt Fryhoek for the Attorney General. Like the Commission, we also asked the Court to affirm the Commission's orders in their entirety. As my colleague alluded to a moment ago, my plan was to focus my presentation on the SHOPS and facilities issues. But I'm prepared to address the Court's questions on any of the issues raised in the appeal. And I'm happy to do so in whatever order the Court would find the most helpful. So turning first to the operational facilities, at a time when its customers were already facing increasingly unaffordable utility bills, People's Gas came to the Commission with a request to increase its rates by over 50%. And the Commission granted People's Gas a majority of the rate increase that it requested, but on this specific issue disallowed the company's request to add over $200 million to its rate base to account for its replacement of these operational facilities. And now in this appeal, the company is seeking to get even that ruling reversed, and this Court should decline. That ruling was supported by the record and consistent with the Commission's statutory responsibility to ensure that utility companies pursue only prudent and reasonable investments. They're 100 years old. Why are we not replacing these? At some point you're throwing good money after bad. I think that theoretically it's possible, Your Honor, but these facilities were old. There was no question about that. And I don't think anybody really disputed that there were problems with the facilities. The company identified employee interviews where employees made various complaints about the state of them. The question was not whether the facilities were old or whether these employee complaints were valid. The question was more specifically whether the evidence that the company submitted justified spending over $200 million, and that's the problem that the Commission identified. But counsel has argued sort of where my question was going. You disallowed all of it. The Commission did disallow all of the costs, Your Honor. So is there some evidence that some of these buildings needed to be replaced? I don't think there was necessarily evidence that any specific building needed to be replaced. Again, it could be possible. Eventually buildings do get old. Occasionally they do need to be replaced. Sometimes that is the more prudent decision than making repairs. It's just the Commission didn't find that the company met its burden of proof on this record to show that wholesale replacements of all these facilities. And the basis was really about insufficient evidence of alternatives and how they were considered and obviously ultimately rejected. Is that your issue? I think that's the main issue. There were a couple others, Your Honor. Also there was the company's, the sufficiency of the company's maintenance practices. The Mortenson Report actually identified insufficient maintenance practices as one of the contributing factors to the state of the building. I mean, let's assume these guys, they did nothing to keep these buildings up. The damage is done. The rain is coming through the roof. At some point, don't you have to make a decision? Is it more cost effective to put on a new roof or to build a new building? Exactly, Your Honor. The company does have to make that decision. I think the issue that the Commission identified was with the company's decision-making process, specifically, as Your Honor alluded to a moment ago, that it insufficiently analyzed alternative options to taking what likely was the most expensive one. So, for example, it could have pursued targeted repairs. Right. But the Mortenson Report concludes time to start over and build new. Why can't they rely on that and why did you not rely on that or consider that sufficient evidence? Because I think the Mortenson Report actually cuts both ways, Your Honor. So the Mortenson Report draws the ultimate conclusion that the company should replace these facilities, but then it also estimates the cost of both repairs and replacements, and it estimates the cost of repairs significantly lower than the cost of replacement. What's the overall 20-year plan on repairs versus rebuild, though? Isn't that part of cost-benefit analysis? That is part of the cost-benefit analysis, Your Honor. I would also point the Court to the Cushman and Wakefield Report. This is another one of the reports that the company submitted, and that actually took into account the 20-year time horizon and concluded that it would actually cost less to make targeted repairs over that time horizon, and that's even factoring in the operations and management savings that the company alleged that would be achieved by pursuing the replacements. So I think this all comes back to what the standard of review is on appeal. Again, the company had the burden of proof in the administrative proceeding. I think at most the company could say that the evidence was ambiguous, that there were, you know, it did offer these reports, it did offer its corporate presentations, but then there were things in the reports that suggested it could have considered alternative options. These alternative options probably would have been significantly less expensive. And cost is not the only thing that factors into the prudence analysis, but if the company is going to spend a very, very large sum of money replacing all of these facilities and try to recover its costs through rate base to do that, all as part of the same rate case, I think it's reasonable for the Commission to expect more quantitative analysis and something more to justify rejecting these options. And he argues that they didn't have notice of that. I don't think that's accurate, Your Honor. So I don't think the Commission's decision came out of nowhere. The Commission's decision came out after a long period of briefing. There was expert testimony submitted by both sides. There was testimony from our engineering expert. There was testimony from the company's employees. There was briefing participation by intervening public interest organizations. So most of the rationale that the Commission developed was borne out in the briefing process, and I think the company had adequate notice of that. And then this also gets back to a point my colleague alluded to a moment ago, which is the prudence standard. This is a fact-intensive inquiry that ultimately hinges on reasonableness, and reasonableness is an objective standard, so it raises a question of fact and also necessarily involves comparing the actions that the company actually took to actions that it could have taken. And the Commission is the body of technical and industry experts that the legislature has entrusted with making these factual determinations. We all appreciate that. So my point here is just to say that there was ample expert testimony that was cutting both ways. The Commission ultimately had to answer a factual question about what was reasonable, what a reasonable utility would have done in terms of evaluating alternatives. Again, there were several obvious ones that the company could have considered, repairs, phasing in replacements over a period of years instead of making them all at once, or purchasing existing buildings. The Commission's problem wasn't that the company failed to pursue any one of these specific options. The Commission's problem was that it failed to present evidence that it meaningfully considered any of them. Again, the burden of proof was on the company to demonstrate the prudence of its own investments, and based on the record. But what's missing? I mean, you've got a report that goes into all these alternatives, and as you point out, Mortensen talks about both sides of the coin. Why isn't that enough? I mean, what more do they need to do? Here's replace, here's repair, refurbish, maybe move. Here's the options. There's no more options than these. We have a report. We have an expert who is a consultant that we've hired to iron all this out and give us a conclusion. Why isn't that enough? Because I think the Commission is entitled to look beyond just the conclusions the consultant made and also look at factors in that consultant's same report that tilt them in a way. So the Commission can dispute the consultant's facts? Is that what you're driving at? And I don't mean to put words in your mouth, but you've lost me there. No, I don't think it's the facts that Mortensen, for example, presented in the report. It's just that it made a recommendation, but then also put forth cost estimates, at least strongly indicating that it would have been significantly less costly to make targeted repairs. Cost alone is not the factor. Right, but I think given all of the totality of the circumstances and all of the evidence that was presented, the Commission could have reasonably erected that conclusion. There was evidence other than the Mortensen report, as one of your honors alluded to before. There was also the study conducted by the Witness for the Public Interest Organizations that analyzed the extent to which any operations and management savings would have been achieved by replacing the existing buildings. And she found that the company could have significantly upped its historical spending on capital repairs without even approaching the amount that it actually spent to make the replacements. So I think the Mortensen report is one piece of evidence. It's an important piece of evidence, but there's features in that report that go the other way. There's also just other evidence beyond the Mortensen report and beyond the company's own reports that tilt the other way. So I think given the very deferential standard of review that applies here, it was not against the manifest weight of the evidence for the Commission to arrive at the result that it arrived at. So why not give them the amount that the Attorney General came up with? So our expert, and I'm referring to Rob Walker's testimony, he did attempt to compute an alternative disallowance, but I think it's important to note that he didn't recommend adopting that alternative disallowance. What was the point of his testimony? I think he was trying to do the best he could. If the Commission decided that it wanted to award some degree of cost recovery, but he ultimately concluded that the Commission shouldn't adopt that proposal because it still doesn't account for the company's failure to analyze alternatives and it also doesn't account for the issues that were identified in the Mortensen report with the company's maintenance practices. So I think the Commission was presented with an alternative, but also presented with a reason and explanation why it shouldn't necessarily adopt it. I think Mr. Walker was just being thorough in his analysis and he ultimately wasn't able to come up with a figure that would have been supported. And then in terms of more broadly why the Commission didn't adopt an alternative disallowance, I think there are just two issues with that. The first relates to the burden of proof, and I'm sorry, Your Honor, I know my time has expired. I'll try to finish up quickly. But I think there is really a two-part issue with that argument. The first is that the burden of proof was not on the Attorney General. It was on the company to demonstrate the prudence of its own investment. And then that's coupled with the specific type of problem that the Commission identified with the company's evidence, which was the failure to analyze alternatives. So if there were a more fulsome record regarding the company's analysis of, say, making targeted repairs or purchasing existing buildings or... But there were, in that Mortenson report, there was a lot, because you're right, it does cut both ways if we did repairs or replacement by moving that type. Why isn't that evidence enough for a, I guess, I don't know if it's a lesser disallowance or a partial allowance for a lower amount that was in some of those reports? Because the report doesn't actually come up with a figure that would really support an alternative disallowance. There would have to be some evidence in the record showing not just the structural issues of the buildings or other issues that the company identified were valid, but that they supported some specific figure that the Commission could award in terms of cost recovery. The Commission can't, for example, reflexively award cost recovery if it doesn't find that a specific investment was prudent. So the company was on notice that there were people opposing this request for rate recovery related to the operational facilities. It could have done that. It could have attempted to build a record on that point. It ultimately didn't, and the Commission concluded there just wasn't enough evidence to find that any amount of this investment was prudent. Well, I have the same question, but maybe in a different way than Justice Jorgensen. If the Commission is not going to look to all of the evidence that's before it, why do they even entertain anything else? I mean, that's the purpose of evidence. It's to get the information out. Are they incapable of choosing the additional information as the correct information for the needs that have been identified, or their job is to just say, we're not going to accept yours, and thank you for testifying otherwise, ladies and gentlemen. Well, Your Honor, I think they accepted the company's testimony. But, again, there was problems in the evidence that the company submitted itself, and there was other evidence in the record indicating that its primary justification from making the replacements wasn't actually borne out in practice. So I think in the entire record, and I think the Commission did consider all of it, or all of the relevant evidence at any rate, it just concluded that the company didn't ultimately meet its burden of proof. So what happens in the meantime with these facilities? Is the rain still coming through the roof? Are people putting out buckets on their desks so they can work? No, I don't think so, Your Honor. This is going to take a minute, so we're going to hold off here. Every Tuesday morning, 10 o'clock. It's going to get way louder here in a minute. You should offer earplugs at this particular hearing, but we do not. But we know we're all safe because of the sirens. One more time. This is why I don't wear my hearing aid. Okay. Very good. Thank you, Your Honor. I think Your Honor's question was about whether rain would be coming through the roof on these new facilities. I don't think there was any danger of that happening. Well, that's what we were just generally talking about. These buildings have problems. Maybe it's not rain, but they have problems. Maybe they have asbestos. Should the employees have to work there with asbestos blowing about the facility? I mean, what's happening in the meantime? Because the funds were not allowed. The funds weren't allowed, Your Honor, but the company was still approved a revenue requirement of over a billion dollars, and over $200 million of that was a non-cash expense for amortization and depreciation expense. So I don't think there was any question that the company was able to perform these constructions. I don't think there was any danger of them being left unfinished. The question that the commission had to answer was not just whether the employee complaints were valid, but whether they justified the specific amount that the company was proposing for a cost recovery. And just based on all of the evidence that was presented to the commission, I think a reasonable set of commissioners could have arrived at that result. Justice Burkett, do you have anything now that we can hear again? No. Well, one observation. It sounds to me, and from reading these briefs, a couple of old English sayings came to mind, that people's gas is being punished because they went in for a penny, in for a pound, and not doing them one by one, but building new facilities all at once. And the commission had a problem with that, right? I think that's correct, Your Honor. The commission's ultimate issue with the company's evidence was about the reasonableness of its decision-making process, not that it failed to pursue any particular kind of construction schedule or failed to make any specific replacement. It was the decision-making process and the company's failure to reasonably analyze alternatives. I think that is the ultimate reasonableness question and, therefore, goes to the ultimate determination about prudence. And I don't think the commission's factual findings on that score were against the manifest weight of the evidence. If the Court has no further questions, then we respectfully ask that the Court affirm the commission's orders in their entirety. Thank you. Thank you. All right. And, Mr. Goldschmidt, if you want to respond, you may do so. Thank you, Your Honors. On the shops, to be clear, this is not merely a question of substantial evidence. We do think that the commission was wrong about whether substantial evidence supported the decision to replace the shops. But you don't need the laundry list of what the commission added to the F-4 rule if you're trying to figure out whether the company just made a reasonable decision. You need that kind of information if you're trying to decide whether the company made the optimal decision, the best decision. That's not the standard. So this is a problem with the standard that the commission imposed. It's not just about substantial evidence. And I think I heard my colleague on the other side say, well, the commission was within its rights to come up with that laundry list because we hadn't really encountered a situation like this before, where the company had to replace three shops at the same time. Five. Five shops at the same time. Yes. Yes. That's not tenable at all. The commission reviews major capital expenditures, has for decades. The BPI line of cases, for example, that went to the Supreme Court of Illinois, dealt with the cost of building three entirely new nuclear generation plants. They know what they're doing, and that's why they have rules for what you need to put in to approve CapEx. And they went beyond that here. And I would note the commission has a separate process for a Certificate of Public Convenience and Necessity. That is a separate rule. It's a separate standard. You have to show more. There's a least cost standard as part of that rule. That's not the route that we took here. We were in a rate case. And the company was essentially subjected to those requirements. Doesn't it just come down to whether the commission felt there was sufficient evidence that you had gone through a alternative because. And it seems to be the devil in the details, the because. That's what counsel, again, not to put words in his mouth, but keeps coming back to, but you didn't give us evidence of why this was discounted, whether it was moving, the replacement, repair. You know, all the alternatives. Respectfully, I don't think it comes down just to that. Because the record is replete with evidence of the alternatives, considered what they would cost over multiple studies. This actually, I think, comes. Who decides what's sufficient? Is it for us to decide? Does the commission decide? The commission decides, and then you review, of course. But the problem really is the standard here. If you were just looking to see whether the company's decision was reasonable as opposed to perfect, then the evidence would have been sufficient. The company was subjected to a higher standard. We heard a lot of talk just now about least cost alternatives that weren't taken. That's not the standard either. So the commission got the standard wrong. It imposed a CPCM-like rule on the companies in this rate case. The CPCM is the Certificate of Public Convenience and Necessity. It basically said you need to make that kind of showing if we're going to approve this capex. And that is not the standard in a rate case. The Schedule F-4 requirements for capital expenditure in the commission's rule is the standard for this case. And we're really focused on the information the commission said it needed over and above that rule. The company should be able to put in the information the rule requires, and if that information is sufficient, that should be the end of it. The problem is the commission asking for more without making a rule and without giving the companies a chance to meet that standard. If I say we considered alternatives, none of them were acceptable, move on. That meets the standard, but that's pretty weak evidence. That would be an assertion, not evidence. We put in evidence, Your Honor. That's what I'm driving at. The quantum of evidence. That's for the commission to decide. But it has to do so consistent with what its rules require and not impose additional informational requirements over and above that rule without making a new rule or giving the companies a chance to meet it. You keep saying that, but when you sort of peel it all away, the question is what is a sufficient cost-benefit analysis? What's enough? And you did talk about those two cases before Ammons and I forget the other one. Yes, Ammons and then the Illinois Power Company case. Yes. And what both of those cases said and what applies squarely on point here is when the rules specify the information that's required and the commission turns around and says we won't approve because you didn't give us even more than that, that's a process problem. That's the fork in the road. Is it more than that or is it the definition of cost-benefit analysis? Well, if we look at just the list of what the commission asked for on page 56 of its order and you square that against the list of information required in the F-4 rule, you will see that the commission is requiring things in its order that are not stated as requirements in the rule. For example, rate impact assessments, just to take one example. That is not something the company has ever been required to provide in its F-4. It might be a good idea. It might be something the commission wants, but it's not an F-4 requirement and the company got a disallowance because it didn't provide it here. That's an Ammon problem. That's an Illinois Power Company problem. I am over my time. I wanted to address two points briefly if you'll allow me. One is still on the shops, the idea of burden shifting because that's an important part of the discussion that I think got a little bit glossed over earlier. There are cases, and I think the key case is the City of Chicago decision cited in our briefs, that make clear that once the utility comes forward with certainly the extensive evidence it came forward with here, all of the hundreds of pages of reports, the testimony explaining the decisions, the burden does shift to the other parties challenging the expenditure to provide and supply their burden for a disallowance. That is really what did not happen here, and the problem is because the commission is getting this idea of burden shifting wrong. The commission is saying the burden is always on the company to prove the prudence of its expenditures, and at a baseline level that's true, but the City of Chicago cases and the ones that followed it, including recently Apple Canyon, make clear that at some point the other side has to make a showing too. And the problem with the shops was that no one actually said, here's the alternative you actually could have pursued that would have been viable and would have cost X. And so the reason that we're spinning around in the record trying to find out, well, what would the cost of an alternative disallowance be? And the reason that we're talking about how the commission can't pull members out of the air is because no one came forward from the AG or staff or anyone else saying, it's our turn now, and this is what you should have spent. But it would have worked. Instead of replacing the shops, you could have done this other thing that would have worked, that would have provided the needs, that would have met the same needs for less money. And without that, there was no basis for imposing a disallowance at all. The commission needs to require the parties advocating a disallowance to meet their burden of proof. And if the commission won't do that or do that clearly, this court needs to remind the commission of that paradigm because it matters. Finally, on the shops, I'm sorry, on S&P, commission counsel said, don't worry, there were no dollars disallowed for work People's Gas actually did. This was a budget. The budget was disallowed. Don't worry about it. That's wrong. That's wrong. There's an unfunded mandate here. And what we need to pay attention to on this point is there is the top line $265 million that People's Gas said it's S&P would cost in full. There is then what the commission told People's Gas to do, which is continue to address leaks and emerging leaks as you would in the ordinary course of business. Isn't that under emergency? No, Your Honor. That's what we said would cost $144.9 million to do. And then the commission said, we'll give you $28.5 million for emergency work, parking basement. That middle row of the analysis between the full S&P that we proposed and the emergency work that the commission funded is an unfunded mandate of $114 million, the difference between our $144.9 and the $28.5 that they allowed. And they said, go do that work. They didn't say, you know, we're giving you $28.5 and all you have to do is put out fires. They said, keep doing your ordinary course of business. We put in evidence showing what that would cost. It was $144.9. No one disagreed. But here's $28.5 to do it. So $0.20 on the dollar. So we did have to go do that work during 2024, during 2025, unfunded. And that issue, Your Honor, is not moot. It's not moot. Next question. Why isn't it moot? Because, first of all, some of that depreciation that would have occurred in the meantime can't be gotten back, even in a new prospective rate order. The BPI-2 case that we cite explains specifically how we deal with retroactive rate making and the issue of depreciation. And that depreciation is significant. But beyond that, even if the company could go in to the next rate case and try to recoup dollars other than lost depreciation and lost return on its investment in the meantime, by the way, there's no guarantee that it will get that in the next rate case. The commission is not saying, come back in and we'll give it to you this time. It said, do the work for free on the chance of a recovery later. That's reversible error. That goes to the core of the utility construct. You can't order a utility to do work for free. And if you're ordering the utility to do it, then by definition it's prudent and therefore must be recoverable at rates. There's no daylight between those things. But now that there is this new case pending, and are you in agreement that it's really not come to fruition yet, it's just pending? Correct. It's in the very initial stages. We just filed initial testimony and have been assigned ALJs. And if that money has been spent, or this unfunded money has been spent, that would be part of your new budget, I assume, or showing loss, or showing what you've paid? We do a forward-looking test here. So now we're asking the commission for approval to increase rates for what we think would spend in 2027 and beyond. As I sit here today, I don't know, and I don't believe in the record, what portion of the past costs we may be trying to recover in the new case. But it doesn't matter. Because the commission has made no guarantees about our ability to recover that money, and the reversible error already occurred because we were forced to work for free. So we need this court to do something about that. It's not me. But you do have the right to, I want to make sure I have this correctly, you do have the right to request that. You just don't have any idea whether it will be granted. Correct. And even if it were granted, it would be prospectively only. The commission can't go back and increase rates to recover a past deficit. That would be retroactive rate making. Okay. So it is certainly less than a whole loaf. Your Honor. I'm well past my time. So thank you for your attention. Justice Burkett, do you have anything that you would like to ask? No. But thank you for the excellent briefs and the arguments today. Thank you. But I agree with Wallace. This is a difficult, complex, very deep issues. And we appreciate the briefs and, of course, arguments this morning. So thank you. Thank you. All right. This case will be taken under advisement. We do thank you for your arguments. We will make a decision in due course. And I, for one, am glad that there was not a lot of physics information because my last physics class was in high school, which you can figure out was a long time ago. Thank you. All rise.